UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RONALD A. CHISHOLM (U.S.A.) INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-3300** |
| **ANPRO TRADING, L.L.C. and PETER J.H. LEGEMAATE** | **SECTION "K"(2)** |

## ORDER AND OPINION

Before the Court are the motion for summary judgment filed on behalf of defendant Peter J. H. Legemaate (Doc. 25) and the motion for summary judgment filed on behalf of plaintiff Ronald A. Chisholm (U.S.A.), Inc . (Doc. 26).  Having reviewed the pleadings, memoranda, and relevant law, the Court, for the reasons assigned, grants both motions and will enter judgment accordingly.

Anpro Trading, L.L.C., ("Anpro") served as the intermediary for a large sale and purchase of skimmed milk powder between Manhattan Foods, Inc. ("Manhattan")  as seller and Ronald A. Chisholm (U.S.A), Inc. ("Chisholm") as buyer. To facilitate the payment of Anpro's commission on the deal, Anpro was to purchase the product from Manhattan and then re-sell it to Chisholm.  The contracts with both Manhattan and Chisholm identify Anpro as the contracting party.

Peter Legemaate,  on behalf of Anpro,  negotiated the terms and condition of the sale and purchase of the product.  In a memorandum to Peter Legemaate, Mariano Carril, the Managing Director of Chisholm,[1] suggested that the purchase contracts  with Manhattan and with Anpro include language that "the product does not come from the Drought Relief Programs," a statement that "[t]his product is legal to sell in the USA," and a statement that "the product be subject to

---

[1] Brian Watson later replaced Mr. Carril as the managing director for Chisholm.

inspection by your company and ours." The January 15, 2005, contract between Anpro as seller and Chisholm as buyer provided for the sale of 25 loads (44,000 lbs. per load) of skim milk powder at $.75 per pound for a total price of $825,000.00 The contract also required that the product be "[e]dible, fit for human consumption, non-restricted. Product does not come from the drought relief programs, does not contain any denaturalization ingredients and is legal to sell in the USA." Doc. 28-4. The contract also contained a "Special Condition," i.e., the "contract is subject to buyer's inspection and approval of the goods. If goods are not approved this contract will automatically become null and void." *Id.*

Prior to receiving the milk powder shipments, Chisholm entered into a contract with Hoogwegt Mexico ("Hoogwegt") for the sale of all of the powdered milk; Hoogwegt agreed to pay a total of $931,500.00 for the product. However, before the sale from Manhattan to Anpro occurred, the United States Department of Agriculture seized the skim milk powder because it was part of a drought relief program.[2]

When Chisholm proved unable to obtain the product from Anpro, Hoogwegt obtained replacement product from a third party and invoiced Chisholm for the $168,500.00 difference in the cost between its contract with Chisholm and what it ultimately paid to a third party to obtain the same quantity of skim milk powder. In turn Chisholm filed suit against Anpro and Peter Legemaate, individually, for breach of contract.

It is undisputed that Peter Legemaate is the sole member of Anpro, a limited liability

---

[2] In 2003, the federal government, in an attempt to reduce its stockpile of powdered milk and to aid drought stricken ranchers, implemented a plan to provide livestock owners with free powdered milk to feed their cattle. Unfortunately, the plan had the unintended result of creating of a lucrative secondary market for the sale of some of the skim milk powder that was part of the program.

company duly authorized under the laws of Louisiana. Additionally, the following facts are uncontested:

> 1. "Anpro filed Articles of Organization and an Initial Report in August 2004, and was issued a Certificate recognizing it as a Louisiana Limited Liability Company by the State of Louisiana,"
>
> 2. "After the company was organized, a bank account was established in Anpro's name with the Whitney, and all of its business transactions were conducted through that account."
>
> 3. "Anpro's regular course of business was to act as an intermediary between purchasers and sellers of various agricultural commodities."
>
> 4. "Most of the work performed by Anpro took place over the telephone, facsimile, or computer, and was performed out of Legemaate's home at 4500 Sheridan Avenue in Metairie, Louisiana."
>
> 5. " Given the relatively small 'overhead' needs of Anpro, it was not necessary to have a large office or an extensive staff."
>
> 6. "At all times after its organization as a limited liability company, Anpro operated on a corporate footing in the commodity trading business."
>
> 7. "Peter Legemaate personally and individually was not a party to the contract sued upon between Chisholm and Anpro."
>
> 8. "All business affairs of the company, including the contract sued upon were conducted in the name of Anpro, not Mr. Legemaate personally."
>
> 9. "Anpro was never required to prepare a financial statement."
>
> 10. "On [sic] a given month, Anpro would have tens of thousands of dollars wired in and out of its corporate account as various deals were completed."

Doc. 24-5.

## LAW AND ANALYSIS

A. Standard for Summary Judgment

The Federal Rules of Civil Procedure provide that summary "judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Stults v. Conoco, Inc.*, 76 F.3f 651, 655-56 (5th Cir. 1996)(*citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912-12 (5th Cir. 1992) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule– set of specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed.R.Civ.P. 56(e)(2)). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588. Finally, the Court notes that substantive law determines the materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

B. Peter Legemaate's Motion for Summary Judgment

Defendant Peter Legemaate seeks dismissal of Chisholm's claim against him contending that Chisholm is not entitled to pierce Anpro's corporate veil to hold him personally liable. When a shareholder asserts the "corporate shield" as a defense in a suit, the shareholder has the initial burden of proving the existence of the corporation. *Shoemaker v. Giacalone*, 793 So.2d 230, 233 (La. App. 2nd Cir. 2001). Because Chisholm concedes that Anpro is a limited liability company, the burden shifts to Chisholm "to show the exceptional circumstances which merit piercing the corporate veil and holding the individual shareholders liable," *Id*. at 233-34. In *Huard v. Shreveport Pirates, Inc.,* 147 F.3d 406, 409-410 (5th Cir. 1998), the Fifth Circuit summarized Louisiana law with respect to piercing the corporate veil stating in pertinent part:

> Because of the benefits associated with use of the corporate form, disregard of the limited liability associated with corporate ownership under the theory of veil piercing is "a drastic remedy and must . . . be construed very narrowly and exercised reluctantly and cautiously."
>
> The Louisiana courts have indicated that the corporate veil should be pierced when adherence to the corporate fiction would clearly result in inequity. The ultimate inquiry, however, requires a balance of the policies behind the recognition of a separate corporate existence with the policies justifying piercing. *This balance is less likely to tip in favor of disregarding the corporate veil when the underlying claim is based on contract.* More stringent standards are justified with respect to contract claims because the plaintiff's claim depends on the existence of a contract in which he chose to rely solely on the obligation of the corporation without any additional guarantees from its shareholders. As such, a plaintiff urging a court to pierce the veil under such circumstances faces an additional hurdle to this already difficult task. As the Supreme Court of Louisiana in *Riggins [v.Dixie Shoring Co., Inc.* 590 So.2d 1164 (La. 1991)] explained:
>
>> "[g]enerally [this] is done where the corporation is found to be simply the 'alter ego' of the shareholder. It usually involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation. Another basis for piercing the corporate veil is when the shareholders disregard the

> requisite corporate formalities to the extent that the corporation ceases to be distinguishable from its shareholders.'
>
> *Riggins*, 590 So.2d at 1168. . . .
>
> In determining whether to apply the alter ego doctrine, the totality of the circumstances must be considered; however, the following factors are usually considered relevant in evaluating adherence to corporate formalities: (1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporating and transacting corporate affairs; (3) undercapitalization; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder and director meetings. Although the jurisprudence indicates that the corporate veil may be pierced without the presence of fraud, "Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing." When fraud has not been alleged, a plaintiff seeking to pierce the corporate veil bears a heavy burden of proof in demonstrating that the corporate form has been disregarded by the shareholders to the extent that the corporation and shareholders are indistinguishable.

(quotations and citations omitted)(emphasis added).

Because the complaint contains no allegations of fraud, malfeasance, or criminal wrongdoing Chisholm's burden is a heavy one. That burden is further enhanced because this is a suit for breach of contract. Chisholm asserts that the totality of the circumstances demonstrate that it is entitled to pierce the corporate veil; however, the only specifics cited by Chisholm to support this contention are that Anpro was undercapitalized and that it failed to follow formalities in the conduct of its business.

With respect to undercapitalization, relying on Peter Legemaate's deposition testimony, Chisholm contends that Mr. Legemaate "left Anpro's coffers lean." Doc. 27, p.2. The following colloquy occurred during Mr. Legemaate's deposition:

> Q. So you would simply write out a figure on a company–by you I mean Mr. Legemaate– would write out on a company check–
>
> A. Correct
>
> Q. – whatever salary you thought AnPro could–
>
> A. – could allow itself.
>
> Q. Could allow itself. Thank you. And you'd sign it?
>
> A. Correct.

Deposition of Peter Legemaate, Doc. 27-2, p.14. The only other evidence of capitalization is Mr. Legemaate's testimony that the initial capitalization of Anpro was $1,000.00. The evidence relied upon by Chisholm does not establish undercapitalization *per se*. Moreover, Chisholm has not provided any other evidence concerning Anpro's financial status or any analysis of its financial status to establish *de facto* undercapitalization.

Additionally, relying on Anpro's failure to hold annual meetings, Chisholm urges that Anpro failed to follow corporate formalities in conducting its business. Peter Legemaate testified that Anpro's organizational documents permit its meetings to be held in person or via telephone and that minutes of the meetings are not required. Doc. 27-4, p. 25. When asked whether the annual informal meetings were held by telephone or otherwise, Mr. Legemaate testified "[t]he meeting– if you use the word meeting– the day-to-day activities of AnPro [sic], which basically was me having a meeting with myself. Whatever way you want to describe it." *Id.* Because Anpro is a single member limited liability company, the failure to hold a designated "annual meeting" does not raise a genuine issue of material fact on the issue of whether Anpro adhered to corporate formalities. "[C]ommentators have generally recognized that adherence to corporate formalities must be substantial, though none have asserted that adherence must be observed 100%." *Riggins v. Dixie*

*Shoring Company, Inc.*, 592 So.2d 1282, 1284 (La. 1992)(concurrence in denial of rehearing). The undisputed facts establish Anpro's "substantial compliance" with corporate formalities.

Considering the totality of the circumstances, including the lack of an allegation of fraud and the fact that this is a suit for breach of contract, summary judgment is appropriate  The purchase agreement between Chisholm and Anpro clearly indicates that the seller is a corporate entity.

> Where the action underlying the request to pierce the corporate veil is based on contract, courts have usually applied more stringent standards to piercing the corporate veil.  The rational for more carefully scrutinizing these factors is that the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and was aware that he would suffer the consequences of limited liability of the shareholders associated with the corporate entity.  Accordingly, absent very compelling equitable considerations, courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established.

*Id.* at 1285. Chisholm has not offered any evidence rebutting the presumption that it voluntarily and knowingly entered into an agreement with a corporate entity, nor has it identified any "compelling equitable considerations" for piercing the corporate veil. Chisholm urges that although Anpro has ceased doing business, it has not been liquidated and therefore could resume business again at Mr. Legemaate's option once this litigation is resolved.  Mr. Legemaate has acknowledged that technical possibility, but such a possibility does not constitute a "compelling equitable consideration" sufficient to warrant piercing Anpro's corporate veil.  One of the well known realities of dealing with a corporate entity is the possibility that it will go out of business. Moreover, if Anpro resumes business, the judgment against it can be enforced at that time.

Because this is a suit for breach of contract with no fraud allegation, defendant has failed to carry its heavy burden of proof with regard to establishing that there is a genuine issue of material

fact concerning whether Anpro operated as an alter ego of Mr. Legemaate so as to warrant piercing Anpro's corporate veil.  Therefore, the Court grants Mr. Legemaate's motion for summary judgment.

### C) Chisholm's Motion for Summary Judgment

Chisholm filed a motion for summary judgment on both liability and damages. It is undisputed that Anpro did not provide Chisholm with the powered milk that was the subject of the contract between Anpro and Chisholm.  Anpro contends that despite its failure to supply Chisholm with the product,  Chisholm is not entitled to summary judgment because the contract is null and void under its own terms.  The contract requires that the product be "legal to sell in the United States," that the product "not come from the drought relief program, " and that the product  be "approved by the parties." Anpro reasons that because  the product was being sold illegally it could not be approved by the parties as required by the contract, and therefore  the contract is  null and void.   Defendant cites no case law in support of its position.

The "Special Condition"  relied upon by Anpro in urging that the contract is null and void gives the buyer the right to inspect and approve the goods.[3]   That condition addresses the quality of the skim milk powder.  Inspection of the skin milk powder  would not have revealed that the product was part of the drought relief program or that the product was illegal to sell in the United States for reasons other than the quality of the product.  Moreover, in his deposition Peter Legemaate testified that Chisholm and Manhattan approved the product, and that "it wasn't essential to approve that product under Anpro.  It was essential that buyer and seller agree that that product was sellable

---

[3] As quoted herein above, the "Special Condition" provides "[t]his contract is subject to buyer's inspection and approval of the goods.  If goods are not approved this contract will automatically become null and void."

and they could purchase it." Doc. 30-2, p. 40.  Anpro may not invoke the "Special Condition" to void the contract where it had the obligation to provide skim milk powder which was not part of the drought relief program.  Chisholm is entitled to summary judgment on the issue of liability.

Turning to the issue of damages,  Chisholm seeks  two items of damages: 1) loss of profit, and 2) the additional cost of the skim milk powder Chisholm had to pay to Hoogwegt because Anpro breached its  contract with Chisholm. The uncontested affidavit of Brian Watson, the general manager of Chisholm, establishes  that Chisholm  agreed to purchase the skim milk from Anpro for a total cost of $825,000.00.  Doc. 26-5.  To establish Chisholm's anticipated income from the sale of the product to Hoogwegt, Brian Watson's affidavit references a memorandum showing  a sale of skim milk powder to Hoogwegt  at a price calculated to be $931,500.[4]  The difference between the price that Chisholm would have paid to Anpro ($825,000.00) and the amount it would have received after the sale to Hoogwegt ($931,500.00) constitutes the lost profit, i.e., $106,500.00

It is well established that in a suit for breach of contract "'[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived.'" *Amoco Production Co. v. Texaco, Inc.*, 838 So.2d 821, 837 (La. App. 3rd Cir. 2003), *quoting* La. Civ. Code art. 1995. Defendant  does not dispute that lost profit is recoverable.  Rather, it   contends  that Chisholm has failed  to  prove  its  lost  profit.  Based  on  the  affidavit  of  Brian  Watson  and  the  attachments  the

---

[4] The memorandum indicates that  Hoogwegt  agreed to purchase "220,440 lbs.  per deal (5 loads per file)" at a cost of $1863.00 per metric ton.  Chisholm's memorandum in support of its motion for summary judgment calculates the amount due from the sale as $931,500.00 based on "5 loads per file (file= reference number) x 5 reference number = 25 loads @ 25KG bags x 800 bags = 20,000 KG/load = 20 MT (metric tons)/load, so 20 MT x 25 loads = 500 MT x $1863 -$931,500)."  Doc. 26-4, p. 1. Anpro does not challenge the calculation itself, only whether Chisholm submitted sufficient proof to be entitled to summary judgment on the claim for lost profit.

affidavit (Anpro's contract with Chisholm and Chisholm's contract with Hoogwegt) Chisholm has provided sufficient proof to establish lost profits of $106,500.00. Anpro has not offered any evidence disputing that amount, but simply urges that a party may not recover damages based on speculative evidence. Here the evidence is not speculative. Chisholm is entitled to summary judgment for $106,500.00 for lost profits.

Chisholm also seeks to recover as damages the $168,500.00, it paid Hoogwegt to reimburse it for the additional cost of obtaining skim milk powder to replace that which Anpro failed to provide. In support of its claim Chisholm submitted a copy of an invoice from Hoogwegt to Chisholm for $168,500.00 as well as the affidavit of Brian Watson which states that he "investigated and determined that the price which Hoogwegt was paying and for which it invoiced Chisholm was the then-current market value of the replacement product" and that Chisholm reimbursed and paid Hoogwegt $168,500.00. Defendant offers no evidence disputing Mr. Watson's affidavit. Based on Mr. Watson's undisputed affidavit and the exhibits attached thereto, the Court concludes that Chisholm is entitled to summary judgment on its claim for the $168,500.00 it paid to Hoogwegt. Accordingly,

**IT IS ORDERED** that the claim of plaintiff Ronald A. Chisholm (U.S.A.), Inc. against defendant Peter Legemaate be and hereby is is dismissed with prejudice;

**IT IS FURTHER ORDERED** that plaintiff Ronald A. Chisholm (U.S.A.), Inc.'s motion for summary judgment be and hereby is Granted;

**IT IS FURTHER ORDERED** that judgment be entered accordingly.

New Orleans, this 22nd day of October, 2008.

_____
STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE